1  BROWNE GEORGE ROSS
   O'BRIEN ANNAGUEY & ELLIS LLP
2  Matthew L. Venezia (State Bar No. 313812)
     mvenezia@bgrfirm.com
3  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
4  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
5
   Attorney for Plaintiff Robert Days
6

7

8                  UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11 | ROBERT DAYS,                          | Case No. 4:21-cv-00696-KAW

12 |            Plaintiff,                  | **FIRST AMENDED COMPLAINT FOR**

13 |     vs.                               | **(1) BREACH OF CONTRACT;**
                                             **(2) CONCEALMENT;**
14 | ROBINHOOD MARKETS, INC.;              | **(3) NEGLIGENT**
   | ROBINHOOD FINANCIAL, LLC; AND        | **MISREPRESENTATION;**
15 | ROBINHOOD SECURITIES, LLC,            | **(4) BREACH OF IMPLIED COVENANT**
                                             **OF GOOD FAITH AND FAIR DEALING;**
16 |            Defendants.                | **(5) BREACH OF FIDUCIARY DUTY;**
                                             **(6) INTENTIONAL INTERFERENCE**
17                                           **WITH PROSPECTIVE ECONOMIC**
                                             **ADVANTAGE;**
18                                           **(7) NEGLIGENT INTERFERENCE WITH**
                                             **PROSPECTIVE ECONOMIC**
19                                           **ADVANTAGE;**
                                             **(8) VIOLATION OF SEC RULE 10B-5;**
20                                           **(9) VIOLATION OF CALIFORNIA'S**
                                             **UNFAIR COMPETITION LAW; AND**
21                                           **(10) VIOLATION OF CALIFORNIA'S**
                                             **CONSUMER LEGAL REMEDIES ACT.**
22
                                             **JURY TRIAL DEMANDED**
23
                                             Trial Date:  None Set
24

25

26

27

28

1    Plaintiff Robert Days ("Plaintiff") brings this Complaint for damages, and equitable and

2 declaratory relief, individually, and on behalf of all persons similarly situated, against defendants

3 Robinhood Markets, Inc., Robinhood Financial, LLC, and Robinhood Securities, LLC

4 (collectively "Robinhood"), and alleges as follows:

5                                    **PARTIES**

6    1.    Robert Days is an individual residing in Kansas City, Missouri.

7    2.    Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood

8 Markets, Inc. is a Delaware corporation with its principal place of business in Menlo Park,

9 California.

10    3.    Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood

11 Financial, LLC is a Delaware limited liability company with its principal place of business in

12 Menlo Park, California.

13    4.    Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood

14 Securities, LLC is a Delaware limited liability company with its principal place of business in

15 Menlo Park, California.

16                           **JURISDICTION AND VENUE**

17    5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

18 1332(d)(2)(A) because the amount in controversy well exceeds $5 million and Plaintiff represents

19 a putative nationwide class that includes well in excess of 100 members, and the named plaintiff is

20 diverse from the defendants, residing in Missouri where the defendants' principal place of

21 business is located in California. Further, upon information and belief, the putative classes defined

22 herein includes members from each of the 50 states.

23    6.    This Court also has subject matter jurisdiction over this action because Plaintiff's

24 claim under SEC Rule 10b-5 raises a federal question pursuant to 28 U.S.C. § 1331, and

25 supplemental jurisdiction for the related state law claims pursuant to 28 U.S.C. § 1367.

26    7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because, upon

27 information and belief, Robinhood's principal place of business is located within this district,

28 Robinhood is subject to personal jurisdiction here, and a substantial part of the events or omissions

1    that gave rise to the claims asserted herein occurred within this district.

2        8.      This Court has personal jurisdiction over Robinhood because, upon information

3    and belief, Robinhood maintains its principal place of business in California, and specifically

4    within this judicial district. This Court also has personal jurisdiction over Robinhood because

5    Robinhood regularly markets and sells its services to customers in California, and the trading

6    restrictions discussed herein were imposed on California customers.

7                                   **GENERAL ALLEGATIONS**

8        A.       **The Robinhood Platform, and How Robinhood Makes Money**

9        9.      Founded in 2013, Robinhood provides a service allowing its customers to place

10    trades in the stock market, targeted at retail customers. Robinhood's platform is primarily app-

11    based and, as hinted by its name, Robinhood represents that it aims to "provide everyone with

12    access to the financial markets, not just the wealthy."

13        10.      Robinhood does more than simply allow its retail customers to place traditional

14    trades. It allows its retail customers to engage in riskier investments, such as purchasing options

15    and trading on margin, regardless of sophistication, on-demand from their cell phone.

16        11.      Robinhood has received significant capital investments, in excess of a billion

17    dollars, from entities like DST Global, Sequoia Capital, and D1 Capital Partners, among others.

18    The latest of these investments valued Robinhood at $11.2 billion.

19        12.      On or about January 28, 2021, Robinhood raised in excess of an additional billion

20    dollars in capital investments from a group of investors, which upon information and belief,

21    included Sequoia Capital and Ribbitt Capital.

22        13.      Upon information and belief, Robinhood has enjoyed exponential growth, now

23    having more than 13 million registered users.

24        14.      While Robinhood advertises "commission-free stock trading[,]" Robinhood in fact

25    earns significant revenues from the trades placed on its platform. As a threshold matter,

26    Robinhood does charge its customers fees for certain services it provides, for example, providing

27    paper statements or its "Gold" membership, allowing customers instant access to a greater amount

28    of deposited funds and the ability to trade on margin.

15.     Moreover, when a customer places a trade on Robinhood, Robinhood routes the trade to one of its "market maker" partners for execution. These market makers pay Robinhood a fee for routing the trade to them (often termed a "rebate"), and execute the trade—standing as a middle man between those looking to buy and sell a particular security. The market makers also receive valuable data concerning the trading behaviors of Robinhood users in this process.

16.     The aforementioned rebates are lucrative, upon information and belief, accounting for approximately $180 million in revenue to Robinhood in just the second quarter of 2020. By placing their trades on Robinhood, Robinhood users provide it the ability to earn these rebates from the market makers, and thus, valuable consideration.

17.     Because Robinhood earns these rebates on a per-transaction basis, Robinhood has traditionally been benefitted by its retail customers engaging in risky, high-frequency trading.

**B.     Rising Investor Interest in Heavily-Shorted Stocks, i.e., the "Short Squeeze"**

18.     Beginning in January of 2021, many retail investors began to purchase positions in highly-shorted securities, such as GameStop Corp. (GME).

19.     As to GME, these investors realized that because in excess of 100 percent of the outstanding shares were shorted, significant purchases of the stock would force those holding excessive short positions, i.e., hedge funds, to compete for available shares to close their short positions, raising the price for the stock.

20.     This trading strategy is known as a "short squeeze." The strategy is not new, tracing its roots back to 1931, when a businessman named Clarence Saunders attempted to purchase the available shares in his Piggly Wiggly grocery chain to combat significant shorting of the stock. A similar strategy was taken in regards to Volkswagen's stock in 2008, with hedge funds losing a reported *30 billion* dollars.

21.     The initial results of the increased investor interest in GME were noteworthy, the price of the stock rose from $17.69 per share on January 8, 2021, to $469.42 per share on the morning of January 28, 2021. The meteoric rise in GME naturally left investors looking for the next highly-shorted stock, and ample information was publicly available to investors indicating that there would be increased interest surrounding other highly-shorted securities, including AMC

1    Entertainment Holdings Inc. (AMC) and Nokia Oyj (NOK), among other similarly-situated stocks.

2          22.    As part of this trend, AMC saw its stock price rise from $2.14 per share on January

3    8, 2021, to $19.88 at the close of the day on January 27, 2021. NOK saw its stock price rise from

4    $3.93 per share on January 8, 2021, to $6.63 at the close of the day on January 27, 2021.

5          **C.    The "Short Squeeze" Stands to Harm Robinhood, Its Investors, and Business**

6          **Partners Financially**

7          23.    The increased popularity of short squeezes in the marketplace stood to cost

8    Robinhood and its investors and business partners a significant amount of money. Upon

9    information and belief, these financial interests were the motivating factor behind Robinhood's

10   below-discussed decision to halt purchases of certain securities and manipulate the market.

11         24.    To begin, upon information and belief, Robinhood routes in excess of 65 percent of

12   its trades to Citadel Securities, LLC, accounting for a large percentage of Robinhood's total

13   revenue. On or about January 25, 2021, Citadel LLC (Citadel Securities, LLC's parent) invested

14   $2 billion in Melvin Capital Management LP, upon information and belief, to bail out Melvin

15   Capital from its huge losses on its short positions in GME. This created a conflict of interest where

16   Robinhood was incentivized to curtail trading in GME in order to benefit its partner Citadel.

17         25.    While the short positions held by the large financial institutions that have invested

18   in and partner with Robinhood are not public information, upon information and belief, similar

19   conflicts of interest exist incentivizing Robinhood to curtail trading in AMC and NOK, amongst

20   other targeted stocks. Upon information and belief, Citadel and other financial institutions holding

21   short positions in AMC and NOK pressured Robinhood to restrict buying of those securities.

22         26.    Moreover, in its attempt to justify its actions in restricting the purchases of certain

23   securities, Robinhood issued a statement claiming that:

24         [C]learinghouses look at a firm's customer holdings as a portfolio.
           They use a volatility multiplier, looking at specific stocks, to
25         quantify their risk. The clearinghouse may assign significant
           additional charges based on how much of one stock a firm's
26         customers hold. If a firm's customers have more buy than sell
           orders, and the securities they're buying are more volatile, the
27         deposit requirement will be higher. Clearinghouses can also require
           additional deposits if certain thresholds are met.

28

1        . . .

2
      The amount required by clearinghouses to cover the settlement
3       period of some securities rose tremendously this week. How much?
      To put it in perspective, this week alone, our clearinghouse-
      mandated deposit requirements related to equities increased ten-fold.
4       And that's what led us to put temporary buying restrictions in place
      on a small number of securities that the clearinghouses had raised
5       their deposit requirements on.

6       27.    Taking Robinhood at its word, what Robinhood explains is that in order to allow its

7 customers continued access to purchasing GME, AMC, NOK, and other similarly-situated stocks,

8 Robinhood would have been forced to deposit additional capital with a clearinghouse. Because

9 access to capital generally has a cost, presumably this would have raised the operating costs for

10 Robinhood to provide its trading platform.

11       28.    This demonstrates another financial interest of Robinhood in stemming the tide of

12 short squeezes—i.e., per Robinhood, these kinds of trades are viewed as more volatile by

13 Robinhood's clearinghouse, and thus, if the short squeezes failed and died out, Robinhood's

14 deposit requirements would be lessened. For a company struggling to meet its deposit

15 requirements, upon information and belief, this concern was an existential threat.

16       29.    Robinhood CEO Vlad Tenev provided additional details about this situation in a

17 recent interview with Elon Musk. In that interview, Mr. Tenev asserts that early in the morning of

18 January 28, 2021, the National Securities Clearing Corporation ("NSCC") requested an

19 approximately $3 billion deposit. Mr. Tenev asserts that after a phone call, the NSCC lowered

20 their request to approximately $1.4 billion. Then, approximately an hour before trading opened on

21 January 28, 2021, the NSCC agreed to lower its deposit request to $700 million, on the condition

22 that Robinhood would restrict trading of certain securities to sell only, as proposed by Robinhood.

23       30.    Thus, per Mr. Tenev's representations, the financial difference to Robinhood in

24 restricting purchases of GME, AMC, NOK, and other similarly-situated stocks was an additional

25 approximately $700 million that Robinhood was either unable, or unwilling, to deposit as

26 collateral with the NSCC. To be clear, this is not a payment, but a deposit requirement to backstop

27 the trades.

28

**D.    Robinhood Bars, and Then Severely Restricts, the Trading of GME, AMC, NOK, and Similarly Situated Stocks on Its Platform**

31.    Until January 28, 2021, Robinhood allowed its users to take positions in GME, AMC, NOK, and other similarly-situated securities, both buying and selling. Many Robinhood customers purchased AMC and NOK in reliance on the continued availability of the Robinhood platform, allowing the customers to buy and sell when most advantageous to do so, with no information to suggest Robinhood could be forced to restrict trading due to insufficient capitalization.

32.    Plaintiff in fact previously purchased positions in AMC and NOK, and intended to purchase additional positions in those securities in the future, all through Robinhood. Plaintiff relied on the continued availability of Robinhood's platform, which he had been informed was backed by a reliable clearinghouse, and had no information concerning Robinhood's lack of required capitalization.

33.    However, on January 28, 2021, after the rise in GME gained widespread media coverage, Robinhood barred its customers from buying several stocks, including AMC and NOK. After a groundswell of outrage, Robinhood announced it will allow "limited buys of these securities" starting on January 29, 2021. Limited was an understatement, and while the amounts of allowed shares have varied, on January 29, 2021, Robinhood users were limited to 1 share of AMC (an approximately $10–$15 investment) and 5 shares of NOK (an approximately $25 investment).

34.    Robinhood's explanations for its actions in halting the trading of certain securities were not originally entirely consistent.

35.    While the above-quoted language in paragraph 26 references increased deposit requirements from Robinhood's clearinghouse, in an e-mail sent to customers on January 28, 2021, Robinhood stated that its decision to restrict trading of certain securities was "made to best continue serving you[,]" with deposit requirements in place to "protect investors and the markets[.]" Similarly, in an interview with CNBC the same day, Robinhood CEO Vlad Tenev represented that the restrictions were put in place because to "protect the firm and ***protect our***

1   *customers* we had to limit buying in these stocks."

2   36.     Moreover, while Robinhood's public statements reference increased deposit

3   requirements, Robinhood has been careful not to say that it would have been impossible for it to

4   meet those deposit requirements, Mr. Tenev represented in his CNBC interview:  "There was no

5   liquidity problem, and to be clear, this was done preemptively."

6   **E.     Plaintiff's and the Putative Classes' Positions in AMC and NOK Were**

7   **Harmed by This Market Manipulation, Whereas Robinhood Benefitted**

8   37.     Robinhood's action in first barring, and then severely limiting, the purchase of

9   AMC and NOK on its platform artificially deflated the price of the stocks, harming all investors

10  who held the stock, to the benefit of those holding short positions. This action further harmed

11  investors who intended to buy the stocks in the future, relying on a fair market to be available in

12  the securities.

13  38.     Ironically, this action was to the benefit of hedge funds that hold short positions in

14  these stocks, allowing them to cover their shorts at a much lower price than they otherwise would

15  have been required to purchase the shares. In other words, Robinhood stole from the poor to give

16  to the rich.

17  39.     The harm caused to shareholders of AMC and NOK by Robinhood's restriction of

18  their purchase on its platform was massive. As to AMC, the stock closed on January 27, 2021 at

19  $19.88 per share. After Robinhood barred purchases on January 28, 2021, AMC closed at $8.63

20  per share, a massive 56.6 percent one-day decrease. In one day, AMC's market capitalization

21  decreased from approximately $5.7 billion to approximately $2.5 billion.

22  40.     As to NOK, the stock closed on January 27, 2021 at $6.63 per share. After

23  Robinhood barred purchases on January 28, 2021, NOK closed at $4.69 per share, a significant

24  29.3 percent one-day decrease. In one day, NOK's market capitalization decreased from

25  approximately $37.3 billion to approximately $26.4 billion.

26  41.     However, even these numbers underestimate the harm caused to the AMC and

27  NOK stocks. Prior to Robinhood's restrictions on purchasing GME, AMC, NOK, and other

28  similarly-situated stocks, the price of GME was skyrocketing and attracting national attention, and

the prices for AMC and NOK were starting to take off as well, attracting increased investor attention as the possible "next GameStop." Retail investor's plans to purchase AMC and NOK on January 28, 2021, and the following days, were well-documented on the WallStreetBets subreddit and other similar platforms across the internet.

42.     Robinhood's restrictions not only stopped this momentum, but allowed a window for those holding short positions in AMC and NOK to cover those shorts at a largely deflated price, upon information and belief, saving hedge funds billions upon billions of dollars as opposed to what would have happened if Robinhood never restricted trading.

43.     Robinhood's manipulation of the market also squelched investor confidence in their ability freely and fairly invest in AMC and NOK, and other similarly-situated securities. Upon information and belief, Robinhood's actions in manipulating the market for these securities scared off a large number of investors who would have otherwise participated in short squeezes of AMC and NOK, massively deflating their stock prices in the short term, and the return available to those holding positions in AMC and NOK.

44.     Plaintiff is a retail customer of Robinhood, holding positions in both AMC and NOK prior to January 28, 2021. Those positions were purchased independently, and without any agreement to do so with any third party. Plaintiff purchased the positions through Robinhood relying upon the continued availability of the platform and free trading of the securities.

45.     Robinhood's action to bar purchases and then severely restrict purchases of those stocks significantly damaged the value of Plaintiff's holdings in AMC and NOK, as it did other holders of those stocks. As explained above, upon news that Robinhood would not allow those stocks to be purchased, only sold, their values fell precipitously.

46.     This left Plaintiff and other Robinhood customers with only two choices, either sell immediately at the rapidly falling price, or hold, and risk losing their entire investment.

47.     Robinhood's actions to restrict purchases of these stocks also disallowed Plaintiff from executing plans to buy additional positions in AMC and NOK, during the restricted period, which otherwise would have been profitable.

48.     Contrarily, Robinhood benefitted. As explained above, by barring and then severely

restricting purchases of AMC, NOK, and other similarly-situated stocks, Robinhood represents that it lowered its deposit requirements with the NSCC. By squelching retail investor interest in short squeezes—trading activity that Robinhood represents raises its deposit requirements— Robinhood would not only decrease its deposit requirements in the short term, but on an ongoing basis, if Robinhood is successful in killing the trend.

49.     These deposit requirements are no small thing—with Robinhood being unable (or unwilling) to meet its deposit requirements on January 28, 2021, continued popularity of trading strategies deemed as "volatile" and requiring larger deposit requirements could quite literally put the firm out of business.

50.     Moreover, it is clear from reports that Robinhood partner Citadel immediately benefitted from Robinhood's actions in barring trading of GME and depressing its price, allowing Citadel/Melvin Capital to cover their shorts at a lower price. Upon information and belief, other Robinhood investors and business partners benefitted similarly from Robinhood's restrictions on purchases of AMC and NOK.

51.     Upon information and belief, this benefit to Robinhood's investors and business partners, in the form of being able to cover their short positions in AMC and NOK at a lower price, was one of Robinhood's motivating factors in its decision to restrict purchases of those securities.

52.     Robinhood's actions are without substantial justification, and made to the detriment of its longstanding customers and the market. Where Robinhood claims it acted to protect its customers or the market, it in fact caused them great harm. Indeed, in Mr. Tenev's recent interview with Elon Musk, he admitted:  "We knew this was a bad outcome for customers."

### F.     Confidence in the Marketplace's Integrity Is Harmed

53.     Robinhood's actions received widespread coverage in the press, with their obvious manipulation of the stock market causing outrage. The SEC shared in the concern, releasing a statement that it would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities."

54.     In a rare moment of bipartisan agreement, both Democratic Representative

Alexandria Ocasio-Cortez and Republican Senator Ted Cruz agreed that Robinhood's actions in restricting the purchases of GME, AMC, NOK, and other similarly-situated stocks, were "unacceptable":



55.     Again, upon information and belief, this unfairness in the stock market, to the benefit of large institutional investors like hedge funds, has already, and will continue to, prevent many retail investors from participating in the market. Specifically, the understanding that hedge funds play by a separate set of rules will prevent many retail traders from engaging in trading strategies that stand to harm hedge funds, like a short squeeze of AMC or NOK, for fear that even if the investment strategy is prudent, hedge funds and other powerful market participants will manipulate the market in their favor.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of himself and putative classes of Robinhood customers who are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

57.     The AMC Class seeks monetary damages and injunctive relief, and is defined as follows:

- All persons or entities in the United States that held a position in AMC on January 28, 2021, purchased through Robinhood, or who intended to invest in AMC through Robinhood during the time period in which Robinhood restricted such

trading, and were harmed by Robinhood's actions to bar and later restrict trading of the stock.

58.     The NOK Class seeks monetary damages and injunctive relief, and is defined as follows:

- All persons or entities in the United States that held a position in NOK on January 28, 2021, purchased through Robinhood, or who intended to invest in NOK through Robinhood during the time period in which Robinhood restricted such trading, and were harmed by Robinhood's actions to bar and later restrict trading of the stock.

59.     Upon information and belief, the AMC Class and NOK Class include millions of investors. The exact number and identities of members for the AMC Class and NOK Class is known or readily ascertainable by Robinhood through a review of records they should maintain. The number of persons who fall within the definition of both classes is so numerous and geographically dispersed as to make joinder of all members of the classes in their individual capacity impracticable, inefficient, and unmanageable so as to effectively deny each putative AMC Class and NOK Class member his, her, or their right to prosecute and obtain legal and equitable relief based on the claims and allegations made in this Complaint.

60.     There are common questions of law and fact as to the AMC Class and NOK Class, relating to and/or dispositive of the allegations made in the Complaint, and damages alleged therein, including, but not limited to:

- Whether Robinhood breached its user agreement when restricting purchasing of AMC and NOK stocks;

- Whether Robinhood's partners and investors held short positions in GME, AMC, NOK, and other similarly-situated stocks, and whether those short positions influenced Robinhood's decision to restrict purchasing of the stocks;

- Whether Robinhood concealed the fact that it lacked the capital to assure the availability of its trading platform;

- Whether Robinhood created a fiduciary duty with its customers by purporting to restrict purchases of certain securities to "protect" them, and whether Robinhood violated any such duty;

- Whether Robinhood intentionally or negligently interfered with its customers planned, profitable transactions in AMC and NOK;

- Whether Robinhood unlawfully manipulated the price of AMC and NOK and acted to squelch investor interest in short squeezes in violation of SEC Rule 10b-5;

- Whether Robinhood engaged in unfair competition pursuant to Cal. Bus. & Prof.

Code § 17200 et seq. by restricting the purchasing of AMC and NOK;

- Whether Robinhood violated California's Consumer Legal Remedies Act Unfair by restricting the purchasing of AMC and NOK; and

- The harm caused to the share price of AMC and NOK from Robinhood's restrictions on the purchasing of those stocks.

61. The interests of Plaintiff, the AMC Class, and the NOK Class are aligned. Plaintiff seeks to establish that Robinhood is liable for financial harm suffered by its customers resulting from their inability to purchase AMC and NOK. Should Plaintiff succeed in establishing such liability, each of the other members of the AMC Class and NOK Class would then be entitled to similar compensation their damages.

62. The claims of Plaintiff are typical of the claims of the AMC Class and NOK Class. Plaintiff purchased positions in AMC and NOK through Robinhood prior to January 28, 2021, those positions being harmed by the inability of Plaintiff and other Robinhood customers to trade in GME, AMC, NOK, and other similarly-situated stocks. Like many others, Plaintiff also intended to purchase further positions in AMC and NOK during the period in which such purchases were restricted.

63. The AMC Class and NOK Class are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, and litigated under California and federal law, in California and federal courts, in connection with claims and certification of nationwide classes. Counsel also has significant experience in high-stakes commercial litigation and securities-related matters.

64. The prosecution of separate actions by individual members of the AMC Class and NOK Class would create a risk of inconsistent or varying adjudications.

65. The questions of law and fact common to the members of the AMC Class and NOK Class predominate over any questions of law or fact affecting only individual members of the AMC Class or NOK Class. Primarily at issue is the appropriateness of the actions of Robinhood in restricting purchases of AMC and NOK.

66. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of

similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the need for repetitious litigation—if it were even feasible for many members of the AMC Class or NOK Class to proceed individually.

67.     Members of the AMC Class and the NOK Class have no cognizable interest in individually litigating and controlling the claims asserted herein as a general matter. To the extent any particular class members have larger claims they desire to individually litigate, such concerns can be addressed by offering class members an opt-out.

68.     California is the proper and a desirable forum for the claims against Robinhood to be litigated. Robinhood is based in California, and its user agreement specifies California law as governing:

> This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

Thus, each of the contract-based claims brought against Robinhood must be governed by California law. To the extent any tort-based claims could be held to escape the scope of this governing law provision, California law provides appropriate remedies to each member of the AMC Class and NOK Class.

69.     The AMC Class and NOK Class are readily ascertainable by review of Robinhood's records, which would also include contact information for the members. Thus, there does not exist any significant likely difficulties in managing the claims as a class action.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

70.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 69 above.

71.     Robinhood, on one hand, and the Plaintiff and putative classes, on the other hand, entered into contracts whereby the Plaintiff and putative classes were allowed to use the

1   Robinhood platform to place trades in the stock market, providing specifically as follows:

2           All orders for the purchase of securities given for My Account will
        be authorized by Me and executed in reliance on My promise that an
3           actual purchase is intended.

4           72.     In consideration for Plaintiff's and the putative classes' ability to use the

5   Robinhood platform to trade, the Plaintiff and the putative classes provided consideration to

6   Robinhood in the form of fees, and the ability to route their trades to market makers from which

7   Robinhood receives additional fees, and access to trading data to sell to third parties, among other

8   valuable consideration.

9           73.     While Robinhood's user agreement does purport to provide Robinhood with the

10  ability to restrict trading in its "sole discretion[,]" that Robinhood only exercise such an option in

11  good faith must be read into the contract or the contract would be rendered illusory.

12          74.     Here, Robinhood either restricted purchases of AMC and NOK, among other

13  similarly-situated stocks, with the intent to benefit its investors and business partners holding short

14  positions in the stocks, and/or to avoid additional operational costs associated with increased

15  clearinghouse deposit requirements. Neither scenario constitutes a good faith reason to restrict the

16  Plaintiff's nor the putative classes' ability to make purchases of the affected stocks.

17          75.     Moreover, the user agreement provides that:

18          I understand that Robinhood Financial has entered into a clearing
        agreement with Robinhood Securities whereby Robinhood Financial
19          will introduce My Account to Robinhood Securities, and Robinhood
        Securities will clear all transactions, on a fully-disclosed basis. I
20          understand that Robinhood Securities carries My Account(s) and is
        responsible for the clearing and bookkeeping of transactions[.]
21

22          76.     To the extent Robinhood Securities refused to clear trades in AMC or NOK, it

23  breached its duty to clear trades on behalf of Plaintiff and the putative classes under the user

24  agreement.

25          77.     As a result of these breaches, the Plaintiff's and the putative classes' positions in

26  AMC and NOK have been substantially harmed.

27

28

## SECOND CAUSE OF ACTION

### (Concealment)

78.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 77 above.

79.     Robinhood disclosed to Plaintiff and the putative classes that it would clear trades in-house through Robinhood Securities. When doing so, Robinhood represented that:

> We've cut more fees and made Robinhood faster and more reliable by rebuilding our systems from the ground up.

80.     Robinhood further boasted:

> Before, Robinhood was only an introducing broker, which means that we used a clearing brokerage for "back office" support, like settling the trades you placed on Robinhood. Using a clearing broker is the industry norm when a company like Robinhood wants to let its users place trades. In fact, the top five clearing firms cleared 1,310 introducing firms in 2016.
>
> Now, Robinhood is also a clearing broker, which means we have complete control over giving you the best experience out there!

81.     What Robinhood failed to disclose—and what its current excuses for restricting purchasing of the affected securities suggests—is that Robinhood was undercapitalized and lacking in liquidity such that it could not provide sufficient capital deposits to allow certain trading on its platform (or would have incurred costs to raise the capital it was unwilling to incur). Indeed, this solution certainly was not "more reliable" than other established clearinghouses, which upon information and belief, were able to allow continued purchasing of GME, AMC, NOK, and other similarly-situated stocks.

82.     For the sake of comparison, Robinhood's old clearing broker, Apex Clearing Corporation, disclosed in excess of $4.3 billion in "[c]ash and securities segregated and on deposit for regulatory purposes" in its Financial Statements and Supplemental Schedules for the year of 2019. Robinhood, on the other hand, was unable or unwilling to meet the NSCC's $1.4 billion deposit request.

83.     This lack of disclosure is particularly troubling given Robinhood's business model, which encourages retail traders to engage in short-term trading using options and margin, risky by

its very nature. It was entirely foreseeable that Robinhood users could engage in trading deemed "volatile" by clearinghouses and thus raise deposit requirements, and if Robinhood had insufficient capital to cover such increased deposit requirements, that should have been disclosed to its customers.

84.     Plaintiff and the putative classes were unaware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading.

85.     Robinhood acted intentionally in concealing this information, knowing that a public admission it lacked sufficient capital to back the platform would decrease customer confidence, and thus lessen the amount of Robinhood users and revenue received by Robinhood.

86.     Had Plaintiff or the putative classes been aware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading, they would have chosen to trade with another firm with sufficient capital to guarantee availability of the trading platform.

87.     Plaintiff and the putative classes were harmed by this omission; their ability to trade in AMC and NOK being restricted, whereas had they chosen another trading platform with sufficient capitalization, this restriction and the resulting harm to their positions in AMC and NOK would not have occurred.

88.     Robinhood's concealment of this information was a substantial factor in causing this harm. It resulted directly in the inability of Plaintiff and the putative classes to freely purchase AMC and NOK, and caused significant damage to the price of shares in those stocks as previously explained.

## **THIRD CAUSE OF ACTION**

### **(Negligent Misrepresentation)**

89.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 88 above.

90.     As quoted above, Robinhood represented that use of Robinhood Securities as Robinhood's clearinghouse would make the Robinhood platform more reliable and "the best

1   experience out there!"

2       91.     Given the undercapitalization described above, resulting in Robinhood restricting

3   purchases of the affected securities, whereas, upon information and belief, other clearinghouses

4   were able to meet deposit requirements, these representations were not true.

5       92.     Robinhood, being aware of its own finances and lack of capitalization when

6   compared to well-established clearinghouses, had no reasonable grounds to believe its

7   representations were true.

8       93.     Robinhood intended that Plaintiff and the putative classes would rely on their

9   representation—the representation being made to assure Robinhood customers that Robinhood

10  would provide a reliable platform to trade in securities.

11      94.     Plaintiff and the putative classes reasonably relied on this misrepresentation, and

12  were harmed by that reliance in the manner described above.

13      95.     As explained above, reliance on this misrepresentation was a substantial factor in

14  the harm caused to the Plaintiff and putative classes, who otherwise would have chosen another

15  platform to trade.

16                          **FOURTH CAUSE OF ACTION**

17                  **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

18      96.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

19  each of the allegations set forth in paragraphs 1 through 95 above.

20      97.     Robinhood, by virtue of its contracts with Plaintiff and the putative classes, had an

21  implied covenant of good faith and fair dealing under those contracts.

22      98.     Plaintiff and the putative classes performed or substantially performed under these

23  contracts by buying and selling securities using the Robinhood platform.

24      99.     Robinhood violated that covenant by restricting the ability of Plaintiff and the

25  putative classes to purchase AMC and NOK.

26      100.    This action was not taken in good faith, but upon information and belief, to

27  manipulate the market by disincentivizing a popular trading strategy that stood to harm Robinhood

28  by way of increased clearinghouse deposit requirements, and harm Robinhood's investors and

1  business partners holding significant short positions in the affected securities.

2      101.   As a result of these breaches, the Plaintiff's and the putative classes' positions in

3  AMC and NOK have been substantially harmed.

4                          **FIFTH CAUSE OF ACTION**

5                          **(Breach of Fiduciary Duty)**

6      102.   Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

7  each of the allegations set forth in paragraphs 1 through 101 above.

8      103.   Robinhood, by taking the action to restrict purchasing of AMC, NOK, and other

9  similarly-situated stocks, purportedly to "protect" it customers, created a fiduciary duty similar to

10  that of an investment advisor.

11      104.   Robinhood breached that duty by acting only in its own interests, to reduce

12  clearinghouse deposit requirements, and upon information and belief, to the financial interests of

13  its investors and business partners holding short positions on AMC and NOK.

14      105.   As a result of these breaches, the Plaintiff's and the putative classes' positions in

15  AMC and NOK have been substantially harmed.

16                          **SIXTH CAUSE OF ACTION**

17                  **(Intentional Interference with Prospective Economic Advantage)**

18      106.   Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

19  each of the allegations set forth in paragraphs 1 through 105 above.

20      107.   The Plaintiff and the putative classes, as set forth in detail herein, stood to make

21  significant profit by virtue of their holdings in and future purchases of AMC and NOK.

22  Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties

23  to sell their shares at a profit in the future.

24      108.   Robinhood intentionally interfered with these future transactions by first barring

25  and then severely restricting purchases of AMC and NOK.

26      109.   This interference artificially depressed the price of shares in AMC and NOK, by

27  not allowing Robinhood customers to purchase these securities and sparking doubt about the

28  security of future trading in these securities more generally.

1        110.    Robinhood had actual knowledge that its customers intended to enter into

2    transactions involving AMC and NOK, the increased investor interest in those stocks receiving

3    significant attention in the public domain, and their restriction being the subject of discussion with

4    the NSCC.

5        111.    Robinhood acted with improper motive in restricting purchases of AMC and NOK,

6    motivated by manipulating the market to disincentive a trading strategy that was stretching its

7    deposit requirements beyond comfort levels and, upon information and belief, benefit its investors

8    and business partners holding short positions in the stocks.

9        112.    This restriction of the ability to purchase AMC and NOK substantially harmed the

10    profitability of Plaintiff's and the putative classes' planned sales of their shares.

11                          **SEVENTH CAUSE OF ACTION**

12                   **(Negligent Interference with Prospective Economic Advantage)**

13        113.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

14    each of the allegations set forth in paragraphs 1 through 112 above.

15        114.    The Plaintiff and the putative classes, as set forth in detail herein, stood to make

16    significant profit by virtue of their holdings in and future purchases of AMC and NOK.

17    Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties

18    to sell their shares at a profit in the future.

19        115.    Robinhood negligently interfered with these future transactions by first barring and

20    then severely restricting purchases of AMC and NOK.

21        116.    This interference artificially depressed the price of shares in AMC and NOK, by

22    not allowing Robinhood customers to purchase these securities and sparking doubt about the

23    security of future trading in these securities more generally.

24        117.    Robinhood had actual knowledge that its customers intended to enter into

25    transactions involving AMC and NOK, the increased investor interest in those stocks receiving

26    significant attention in the public domain, and their restriction being the subject of discussion with

27    the NSCC.

28        118.    Robinhood failed to act with reasonable care when implementing these restrictions.

119.     Robinhood acted with improper motive in restricting purchases of AMC and NOK, motivated by manipulating the market to disincentive a trading strategy that was stretching its deposit requirements beyond comfort levels and, upon information and belief, benefit its investors and business partners holding short positions in the stocks.

120.     This restriction of the ability to purchase AMC and NOK harmed the profitability of Plaintiff's and the putative classes' planned sales of their shares, and was a substantial cause of the same.

## EIGHTH CAUSE OF ACTION

### (Violation of SEC Rule 10b-5)

121.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 120 above.

122.     Robinhood engaged in a scheme to manipulate the market and disincentivize the trending short squeeze trading strategy by restricting purchases of GME, AMC, NOK, and other similarly-situated stocks, and thus artificially deflating their value.

123.     This cessation of purchases lowered the prices for these stocks not only because less buyers were in the market with Robinhood customers shut out, but by increasing fears related to market security in the future trading of these securities.

124.     Robinhood acted with scienter, i.e., Robinhood was motivated to stop its customers from engaging in a trading strategy perceived as volatile such that Robinhood's deposit requirements were being raised to a level it could not or was unwilling to meet. Instead of cutting some of its riskier services platform-wide, like options and margin trading, that it apparently could not afford to provide, or working with a third-party clearinghouse with greater access to capital, Robinhood did what it could to torpedo the short squeeze trading strategy.

125.     Moreover, upon information and belief, Robinhood was motivated to benefit its investors and business partners holding short positions in AMC, NOK, and other similarly-situated stocks. Upon information and belief, these investors and business partners exerted pressure on Robinhood to restrict trading, and Robinhood caved to that pressure.

126.     This market manipulation damaged the value of the Plaintiff's and putative classes'

holdings in AMC and NOK.

## NINTH CAUSE OF ACTION

### (Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.])

127.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 126 above.

128.     The aforementioned conduct by Robinhood is unlawful, violating California and Federal securities laws.

129.     Robinhood engaged in unfair competition in the classic sense by purporting to offer a trading platform backed by sufficient capital, when it was not, thus stealing customers that otherwise would have chosen other platforms.

130.     It also engaged in unfair competition in the classic sense by not allowing its customers to fairly compete with institutional investors when it comes to trading AMC and NOK, and other similarly-situated stocks.

131.     Plaintiff and each member of the putative classes suffered an injury as a direct and proximate result of Robinhood's unlawful and anticompetitive conduct.

132.     Upon information and belief, the above-described unlawful conduct occurred in significant portion within California.

## TENTH CAUSE OF ACTION

### (Violation of California's Consumer Legal Remedies Act Unfair [Cal. Civ. Code § 1750 et seq.])

133.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 132 above.

134.     Robinhood has committed unlawful acts as defined by California Civil Code § 1770, by engaging in the unlawful practices described above.

135.     Plaintiff and each member of the putative classes suffered an injury as a direct and proximate result of Robinhood's unlawful activity.

136.     Unless enjoined, Robinhood will continue to unlawfully interfere in the market for highly-shorted stocks, like AMC and NOK.

1  137. Upon information and belief, the above-described operations of Robinhood occur

2 in California, where it is headquartered.

3            **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiff, the putative AMC Class, and the putative NOK Class, pray for

5 relief against Robinhood as follows:

6  1. For preliminary and permanent injunctions enjoining and restraining Robinhood

7 from restraining or attempting to restrain its customers from trading in AMC or NOK, or other

8 securities with significant short positions;

9  2. For money damages in the form of the lessened value in their AMC and NOK

10 positions, and loss of future profitable acquisitions of AMC and NOK positions, in an amount

11 according to proof, but well in excess of $5 million;

12  3. For punitive damages according to proof;

13  4. For pre-judgment interest on all damages awarded by this Court;

14  5. For reasonable attorneys' fees and costs of suit incurred herein; and

15  6. For any other such relief as this Court deems just and proper.

16 DATED:  February 1, 2021    BROWNE GEORGE ROSS

17           O'BRIEN ANNAGUEY & ELLIS LLP
           Matthew L. Venezia

18

19       By:  */s/ Matthew L. Venezia*

20         Matthew L. Venezia
       Attorney for Plaintiff Robert Days

21

22

23

24

25

26

27

28

1

## <u>DEMAND FOR JURY TRIAL</u>

2     Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

3  Civil Procedure.

4  DATED:  February 1, 2021          BROWNE GEORGE ROSS
                                      O'BRIEN ANNAGUEY & ELLIS LLP
5                                          Matthew L. Venezia

6

7                                    By:    _____/s/ Matthew L. Venezia_____
                                                Matthew L. Venezia
8                                         Attorney for Plaintiff Robert Days

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT