BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@bgrfirm.com
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Katherine F. Murray (State Bar No. 211987)
  kmurray@bgrfirm.com
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:     (310) 274-7100
Facsimile:      (310) 275-5697

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Carl Alan Roth (State Bar No. 151517)
  croth@bgrfirm.com
801 South Figueroa, Suite 2000
Los Angeles, California  90017
Telephone:     (213) 258-4710
Facsimile:      (213) 725-9808

Attorneys for Plaintiff ROBERT DAYS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| ROBERT DAYS, | Case No. 4:21-cv-00696-HSG |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR:** |
| vs. | **(1) BREACH OF CONTRACT;** |
| | **(2) CONCEALMENT;** |
| ROBINHOOD MARKETS, INC.; | **(3) NEGLIGENT** |
| ROBINHOOD FINANCIAL, LLC; AND | **MISREPRESENTATION;** |
| ROBINHOOD SECURITIES, LLC, | **(4) BREACH OF IMPLIED COVENANT** |
| | **OF GOOD FAITH AND FAIR DEALING;** |
| Defendants. | **(5) BREACH OF FIDUCIARY DUTY;** |
| | **(6) INTENTIONAL INTERFERENCE** |
| | **WITH PROSPECTIVE ECONOMIC** |
| | **ADVANTAGE;** |
| | **(7) NEGLIGENT INTERFERENCE WITH** |
| | **PROSPECTIVE ECONOMIC** |
| | **ADVANTAGE;** |
| | **(8) VIOLATION OF CALIFORNIA'S** |
| | **UNFAIR COMPETITION LAW; AND** |
| | **(9) VIOLATION OF CALIFORNIA'S** |
| | **CONSUMER LEGAL REMEDIES ACT.** |
| | **JURY TRIAL DEMANDED** |
| | Trial Date:  None Set |

Plaintiff Robert Days ("Plaintiff") brings this Complaint for damages, and equitable and declaratory relief, individually, and on behalf of all persons similarly situated, against defendants Robinhood Markets, Inc., Robinhood Financial, LLC, and Robinhood Securities, LLC (collectively "Robinhood"), and alleges as follows:

**INTRODUCTION**

1.     Robinhood's claimed mission to "democratize finance for all" would be laudable. Unfortunately, in every step of its journey, Robinhood has put its own financial interests above those of its customers and failed to fulfill its mantra.

2.     Much ink has been spilled concerning the harm to customers stemming from Robinhood's payment for order flow business model. We will not belabor the point here, other than to emphasize that while risky, high frequency trading benefits Robinhood because it makes money on a per-transaction basis, it harms customers. Encouraging customers to engage in high-frequency options trading on margin, regardless of sophistication, will lead to significantly worse outcomes than simply investing in index funds. In a recent Congressional hearing, Robinhood CEO Vlad Tenev essentially confirmed as much when he refused to answer whether Robinhood customers had outperformed the market.

3.     Nonetheless, at issue in this case, is the financially irresponsible manner in which Robinhood has handled its expansion. While Robinhood positions itself as a popular app, celebrating its amount of users, similar to a social media platform, it is more. Robinhood is a financial services company that has now gotten "out in front of its skis" on multiple occasions, harming its customers because it did not have the financial infrastructure to support its operations.

4.     Subject to separate litigation, in March of 2020, Robinhood's trading platform suffered outages which even Robinhood admitted "are not acceptable[.]" But, Robinhood attempted to excuse the outages by arguing:

> Multiple factors contributed to the unprecedented load that ultimately led to the outages. The factors included, among others, highly volatile and historic market conditions; record volume; and record account sign-ups.

In other words, Robinhood was not prepared to support the growth of its trading platform.

5.      Thereafter, in May of 2020, Robinhood announced that it had raised additional capital. In an effort to assure customers, Robinhood represented that it would use this funding "to invest in scaling our platform, building new products, and accelerating build-out of our operations." Then, in August of 2020, Robinhood announced that it had raised additional capital, again, representing that Robinhood would "continue to invest in improving our core product and customer experience." These statements were misleading.

6.      In January of 2021, Robinhood's failure to adequately capitalize its trading platform was laid bare for the nation to witness. When retail investors were in the midst of successful short squeezes of GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), and Nokia Oyj (NOK), and other similarly-situated stocks, Robinhood halted purchases of the securities on its platform, tanking their price and causing its customers to lose enormous amounts of money. Even Mr. Tenev admitted Robinhood "knew this was a bad outcome for customers."

7.      Robinhood again attempted to excuse its behavior by arguing that unprecedented volatility occurred in the market, raising its clearinghouse deposit requirements to an unforeseeable level, and forcing Robinhood's hand. The unforeseen volatility excuse was not good enough in March of 2020, and it is not good enough now. Adequately capitalized brokerages were able to avoid placing restrictions on the purchases of GME, AMC, NOK, and other similarly-situated stocks.

8.      This makes clear that when Robinhood moved to clearing trades in-house through its Robinhood Securities entity in 2018, it was patently unprepared financially for such an endeavor. Robinhood had only a small fraction of the capital of other established clearing brokers to deposit as collateral for trading on its platform. And, when the rubber met the road in January of 2021, Robinhood lacked sufficient capital to ensure the continuity of trading on its platform.

9.      At minimum, this lack of capitalization should have been disclosed to customers in 2018 when Robinhood began "Clearing by Robinhood." And, it should have been disclosed again when Robinhood suffered outages because it was unprepared for its growth. Instead, every step of the way, Robinhood ensured customers that its platform was reliable, and only suffered outages because of unforeseeable events beyond its control, e.g., "historic market conditions."

10.     Taking Robinhood at its word, increased clearinghouse deposit requirements in January of 2021 were a challenge for the business. However, consistent with its prior course of conduct, Robinhood chose to address the problem by focusing only on its own interests to the detriment of its customers.

11.     Instead of raising the capital needed to make required clearinghouse deposits (presumably at the cost of diluting Robinhood's current owners or the interest on money borrowed), Robinhood chose to restrict the purchases of GME, AMC, NOK, and other similarly-situated stocks, tanking the value of those stocks, and squelching investor interest in short squeezes, and confidence in the integrity of the market more generally. Upon information and belief, Robinhood took this step with the intent that it would result in lower clearinghouse deposit requirements and solve its liquidity issue.[1]

12.     While perhaps now trite, the irony in Robinhood's actions is inescapable— Robinhood chose to benefit the rich (Robinhood and its investors) to the detriment of the poor (its customers).

## **PARTIES**

13.     Robert Days is an individual residing in Kansas City, Missouri.

14.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

15.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Financial, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

16.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business in

---

[1] Robinhood's ability to raise $3.4 billion in additional capital shortly thereafter suggests it could have done so prior to January 28, 2021, to ensure continuity of its trading platform, had it been so willing.

1  Lake Mary, Florida.

2  **JURISDICTION AND VENUE**

3  17.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

4  1332(d)(2)(A) because the amount in controversy well exceeds $5 million and Plaintiff represents

5  a putative nationwide class that includes well in excess of 100 members, and the named plaintiff is

6  diverse from the defendants, residing in Missouri where the defendants' principal places of

7  business are located in California and Florida. Further, upon information and belief, the putative

8  classes defined herein include members from each of the 50 states.

9  18.  Venue in this district is proper pursuant to 28 U.S.C. § 1391 because, upon

10  information and belief, two of the three Robinhood entities' principal places of business are

11  located within this district, Robinhood is subject to personal jurisdiction here, and a substantial

12  part of the events or omissions that gave rise to the claims asserted herein occurred within this

13  district.

14  19.  This Court has personal jurisdiction over Robinhood because, upon information

15  and belief, Robinhood maintains its principal place of business in California (while the Robinhood

16  Securities entity has an office in Florida, it is owned and controlled by its corporate parent in

17  California), and specifically within this judicial district. This Court also has personal jurisdiction

18  over Robinhood because Robinhood regularly markets and sells its services to customers in

19  California, and the trading restrictions discussed herein were imposed on California customers.

20  **GENERAL ALLEGATIONS**

21  **A.**   **The Robinhood Platform, and How Robinhood Makes Money**

22  20.  Founded in 2013, Robinhood provides a service allowing its customers to place

23  trades in the stock market, targeted at retail customers. Robinhood's platform is primarily app-

24  based and, as hinted by its name, Robinhood represents that it aims to "provide everyone with

25  access to the financial markets, not just the wealthy."

26  21.  Robinhood does more than simply allow its retail customers to place traditional

27  trades. It allows its retail customers to engage in riskier investments, such as purchasing options

28  and trading on margin, regardless of sophistication, on-demand from their cell phone.

22.     Prior to the incidents of late-January 2021, Robinhood received significant capital investments, in excess of a billion dollars, from entities like DST Global, Sequoia Capital, and D1 Capital Partners, among others. The latest of these investments valued Robinhood at $11.2 billion.

23.     On or about January 28, 2021, Robinhood raised in excess of an additional billion dollars in capital investments from a group of investors, which upon information and belief, included Sequoia Capital and Ribbitt Capital.

24.     Upon information and belief, Robinhood has enjoyed exponential growth, now having more than 13 million registered users.

25.     While Robinhood advertises "commission-free stock trading[,]" Robinhood in fact earns significant revenues from the trades placed on its platform. As a threshold matter, Robinhood does charge its customers fees for certain services it provides, for example, providing paper statements or its "Gold" membership, allowing customers instant access to a greater amount of deposited funds and the ability to trade on margin.

26.     Moreover, when a customer places a trade on Robinhood, Robinhood routes the trade to one of its "market maker" partners for execution. These market makers pay Robinhood a fee for routing the trade to them (often termed a "rebate"), and execute the trade—standing as a middle man between those looking to buy and sell a particular security. The market makers also receive valuable data concerning the trading behaviors of Robinhood users in this process.

27.     The aforementioned rebates are lucrative, upon information and belief, accounting for approximately $180 million in revenue to Robinhood in just the second quarter of 2020. By placing their trades on Robinhood, Robinhood users provide it the ability to earn these rebates from the market makers, and thus, valuable consideration.

28.     Because Robinhood earns these rebates on a per-transaction basis, Robinhood has traditionally been benefitted by its retail customers engaging in risky, high-frequency trading.

**B.      Robinhood Moves to "Clearing by Robinhood", Through Its Robinhood Securities Entity**

29.     On or about October of 2018, Robinhood announced that it would clear trades in-house, referring to the program as "Clearing by Robinhood." Clearing would be performed

1   through Robinhood Securities, a subsidiary of Robinhood Markets.

2        30.    On October 10, 2018, Robinhood made an enouncement on its website entitled

3   *Introducing Clearing by Robinhood*. This announcement described Clearing by Robinhood as "*A*

4   *new system that lowers fees and makes Robinhood faster and more reliable*[.]" The announcement

5   further explained that this was a "complex engineering and regulatory challenge[,]" but assured

6   customers by stating Robinhood "received licenses from FINRA, the DTCC, and the OCC

7   (Options Clearing Corporation); we assembled a team of nearly 100 people in Lake Mary, Florida,

8   many of whom specialize in clearing and compliance[.]" A true and correct copy of this

9   announcement is attached as Exhibit 1.

10       31.    Upon information and belief, Robinhood coordinated press coverage for Clearing

11   by Robinhood. As one example, on October 10, 2018, CNBC published an article titled

12   *Robinhood launches its own trade-clearing system as customer growth surges*. Robinhood CEO

13   Vlad Tenev and Product Lead Christine Hall were interviewed for the article, and upon

14   information and belief, their statements and Robinhood's announcement of the same day form the

15   basis of the factual claims made in the article. A true and correct copy of this announcement is

16   attached as Exhibit 2.

17       32.    Robinhood also published a page on its website within its Help Center entitled

18   *What's Clearing by Robinhood?* On this page, Robinhood represented that:

19
20           We've cut more fees and made Robinhood faster and more reliable
          by rebuilding our systems from the ground up.

21       33.    Robinhood further boasted:

22           Before, Robinhood was only an introducing broker, which means
23           that we used a clearing brokerage for "back office" support, like
          settling the trades you placed on Robinhood. Using a clearing broker
          is the industry norm when a company like Robinhood wants to let its
24           users place trades. In fact, the top five clearing firms cleared 1,310
          introducing firms in 2016.
25
          Now, Robinhood is also a clearing broker, which means we have
26           complete control over giving you the best experience out there!

27   A true and correct copy of this page is attached hereto as Exhibit 3.

28       34.    On October 16, 2018, Robinhood published another article entitled *Under the Hood*

*of Clearing by Robinhood*. In this article, Robinhood discussed the development of its in-house clearing platform, and the challenges faced by Robinhood in so doing. A true and correct copy of this page is attached hereto as Exhibit 4.

35.     What Robinhood failed to disclose in any of these statements—and what its current excuses for restricting purchasing of the affected securities suggests—is that Robinhood was undercapitalized and lacking in liquidity such that it could not make sufficient capital deposits to allow certain trading on its platform (or would have incurred costs to raise the capital it was unwilling to incur). Indeed, this solution certainly was not "more reliable" than other established clearinghouses, which upon information and belief, were able to allow continued purchasing of GME, AMC, NOK, and other similarly-situated stocks.

36.     For the sake of comparison, Robinhood's old clearing broker, Apex Clearing Corporation, disclosed in excess of $4.3 billion in "[c]ash and securities segregated and on deposit for regulatory purposes" in its Financial Statements and Supplemental Schedules for the year of 2019. Robinhood Securities, on the other hand, upon information and belief, had less than $1.3 billion in total net capital as of the morning of January 28, 2021.

37.     This lack of disclosure is particularly troubling given Robinhood's business model, which encourages retail traders to engage in short-term trading using options and margin, risky by its very nature. It was entirely foreseeable that Robinhood users could engage in trading deemed "volatile" by its clearinghouse and thus increase Robinhood's deposit requirements.

**C.     Rising Investor Interest in Heavily-Shorted Stocks, i.e., the "Short Squeeze"**

38.     Beginning in January of 2021, many retail investors began to purchase positions in highly-shorted securities, such as GME.

39.     As to GME, these investors realized that because in excess of 100 percent of the outstanding shares were shorted, significant purchases of the stock would force those holding excessive short positions, i.e., hedge funds, to compete for available shares to close their short positions, raising the price for the stock.

40.     This trading strategy is known as a "short squeeze." The strategy is not new, tracing its roots back to 1931, when a businessman named Clarence Saunders attempted to

1 purchase the available shares in his Piggly Wiggly grocery chain to combat significant shorting of

2 the stock. A similar strategy was taken in regards to Volkswagen's stock in 2008, with hedge

3 funds losing a reported *30 billion* dollars.

4        41.    The initial results of the increased investor interest in GME were noteworthy, the

5 price of the stock rose from $17.69 per share on January 8, 2021, to $469.42 per share on the

6 morning of January 28, 2021. The meteoric rise in GME naturally left investors looking for the

7 next highly-shorted stock, and ample information was publicly available to investors indicating

8 that there would be increased interest surrounding other highly-shorted securities, including AMC

9 and NOK, among other similarly-situated stocks.

10        42.    As part of this trend, AMC saw its stock price rise from $2.14 per share on January

11 8, 2021, to $19.88 at the close of the day on January 27, 2021. NOK saw its stock price rise from

12 $3.93 per share on January 8, 2021, to $6.63 at the close of the day on January 27, 2021.

13      **D.**     **The "Short Squeeze" Stands to Harm Robinhood and Its Investors Financially**

14        43.    The increased popularity of short squeezes in the marketplace stood to cost

15 Robinhood and its investors a significant amount of money. Upon information and belief, these

16 financial interests were the motivating factor behind Robinhood's below-discussed decision to halt

17 purchases of certain securities.

18        44.    In its attempt to justify its actions in restricting the purchases of certain securities,

19 Robinhood issued a statement stating that:

20          [C]learinghouses look at a firm's customer holdings as a portfolio.
         They use a volatility multiplier, looking at specific stocks, to

21          quantify their risk. The clearinghouse may assign significant
         additional charges based on how much of one stock a firm's

22          customers hold. If a firm's customers have more buy than sell
         orders, and the securities they're buying are more volatile, the

23          deposit requirement will be higher. Clearinghouses can also require
         additional deposits if certain thresholds are met.

24

25          . . . The amount required by clearinghouses to cover the settlement
         period of some securities rose tremendously this week. How much?

26          To put it in perspective, this week alone, our clearinghouse-
         mandated deposit requirements related to equities increased ten-fold.

27          And that's what led us to put temporary buying restrictions in place
         on a small number of securities that the clearinghouses had raised

28          their deposit requirements on.

45.     Taking Robinhood at its word, what Robinhood explains is that in order to allow its customers continued access to purchasing GME, AMC, NOK, and other similarly-situated stocks, Robinhood would have been forced to deposit additional capital with a clearinghouse. Because access to capital generally has a cost, presumably this would have raised the operating costs for Robinhood to provide its trading platform, or required Robinhood's current owners to dilute their ownership interest.

46.     This demonstrates a significant financial interest of Robinhood in stemming the tide of short squeezes—i.e., per Robinhood, these kinds of trades are viewed as more volatile by Robinhood's clearinghouse, and thus, if the short squeezes failed and died out, Robinhood's deposit requirements would be lessened. For a company struggling to meet its deposit requirements, upon information and belief, this concern was an existential threat.

47.     On January 31, 2021, Mr. Tenev provided additional details about this situation in an interview with Elon Musk. In that interview, Mr. Tenev asserted that early in the morning of January 28, 2021, the National Securities Clearing Corporation ("NSCC") requested an approximately $3 billion deposit. Mr. Tenev further asserted that after a phone call, the NSCC lowered their request to approximately $1.4 billion. Then, approximately an hour before trading opened on January 28, 2021, the NSCC agreed to lower its deposit request to $700 million, on the condition that Robinhood would restrict trading of certain securities to sell only, as proposed by Robinhood.

48.     Thus, per Mr. Tenev's original representations, the financial difference to Robinhood in restricting purchases of GME, AMC, NOK, and other similarly-situated stocks, was an additional approximately $700 million that Robinhood was either unable, or unwilling, to deposit as collateral with the NSCC. To be clear, this is not a payment, but a deposit requirement to backstop the trades.

49.     On February 18, 2021, Mr. Tenev provided additional details in his prepared testimony to the United States House of Representatives Financial Services Committee. This testimony largely tracked Mr. Tenev's interview with Mr. Musk, but not exactly.

50.     In that testimony, Mr. Tenev testified that, on January 27, 2021, Robinhood's base

1   clearinghouse deposit requirement was $696 million. This amount is referred to as a "Value-at-

2   Risk" collateral requirement ("VaR").

3          51.     Mr. Tenev further testified that, early on the morning of January 28, 2021,

4   Robinhood received notice that its VaR collateral requirement increased to $1.3 billion. However,

5   because $1.3 billion exceeded Robinhood Securities' net capital, an additional $2.2 billion "excess

6   capital premium charge" was imposed by the NSCC, raising Robinhood's total deposit

7   requirement to $3.7 billion. (These numbers do not exactly add up, and a chart later provided gave

8   the VaR deposit requirement for January 28, 2021 as $1.4 billion.)

9          52.     Thus, while Robinhood uses the $3 billion deposit request as a justification for its

10  restrictions on trading, upon information and belief, if Robinhood Securities had $1.3 billion in net

11  capital, the excess capital premium charge would never have been imposed, and Robinhood could

12  have satisfied its clearinghouse deposit requirements without restricting purchases. That would

13  have been an increase of $604 million, not $3 billion.

14         53.     Ultimately, after discussions with the NSCC, and Robinhood's agreement to

15  restrict purchases of certain securities, Mr. Tenev testified that the NSCC dropped the excess

16  capital premium charge, and Robinhood was able to make an additional $737 million deposit such

17  that trading could go forward on a limited basis.

18         54.     It is not publicly known how Robinhood was able to make this deposit, given that

19  Robinhood Securities reportedly had less than $1.3 billion net capital earlier that morning,

20  however, as noted above, it has been reported Robinhood raised in excess of an additional $1

21  billion in capital the same day. Robinhood also referenced drawing on a line of credit in a court

22  filing in the Central District of California.

23         55.     Despite Robinhood's protests to the contrary, it is now clear that Robinhood

24  suffered a liquidity crisis. That is, upon information and belief, if Robinhood Securities had

25  sufficient net capital to avoid the excess capital premium charge, Robinhood could have avoided

26  any restrictions on the purchases of the restricted securities by making a total clearinghouse

27  deposit of $1.3 billion. Alternatively, even considering the excess capital premium charge, if

28  Robinhood had sufficient capital to make the required clearinghouse deposit, Robinhood could

1  have avoided placing any restrictions on purchasing. But, it did not.

2       56.     On February 23, 2021, Mr. Tenev admitted as much in an interview with Dave

3  Portnoy of Barstool Sports, stating, "If we had a bunch more headroom, uhh, yes, we probably

4  would have let things continue."

5       **E.**     **Robinhood Bars, and Then Severely Restricts, the Trading of GME, AMC,**

6              **NOK, and Similarly Situated Stocks on Its Platform**

7       57.     Until January 28, 2021, Robinhood allowed its users to take positions in GME,

8  AMC, NOK, and other similarly-situated securities, both buying and selling. Many Robinhood

9  customers purchased AMC and NOK in reliance on the continued availability of the Robinhood

10  platform, allowing the customers to buy and sell when most advantageous to do so, with no

11  information to suggest Robinhood could be forced to restrict trading due to insufficient

12  capitalization.

13       58.     Plaintiff in fact previously purchased positions in AMC and NOK, and intended to

14  purchase additional positions in those securities in the future, all through Robinhood. Plaintiff

15  relied on the continued availability of Robinhood's platform, which he had been informed was

16  backed by a reliable clearinghouse, and had no information concerning Robinhood's lack of

17  required capitalization.

18       59.     However, on January 28, 2021, after the rise in GME gained widespread media

19  coverage, Robinhood barred its customers from buying several stocks, including AMC and NOK.

20  After a groundswell of outrage, Robinhood announced it will allow "limited buys of these

21  securities" starting on January 29, 2021. Limited was an understatement, and while the amounts of

22  allowed shares have varied, on January 29, 2021, Robinhood users were limited to 1 share of

23  AMC (an approximately $10–$15 investment) and 5 shares of NOK (an approximately $25

24  investment).

25       60.     Robinhood's explanations for its actions in halting the trading of certain securities

26  were not originally entirely consistent.

27       61.     While the above-quoted statements reference increased deposit requirements from

28  Robinhood's clearinghouse, in an e-mail sent to customers on January 28, 2021, Robinhood stated

that its decision to restrict trading of certain securities was "made to best continue serving you[,]" with deposit requirements in place to "protect investors and the markets[.]" Similarly, in an interview with CNBC the same day, Robinhood CEO Vlad Tenev represented that the restrictions were put in place because to "protect the firm and **_protect our customers_** we had to limit buying in these stocks."

62.     Moreover, while Robinhood's public statements reference increased deposit requirements, Robinhood has been hesitant to admit a liquidity problem. Mr. Tenev represented in his CNBC interview:  "There was no liquidity problem, and to be clear, this was done preemptively."

**F.     Plaintiff's and the Putative Classes' Positions in AMC and NOK Were Harmed by This Market Manipulation, Whereas Robinhood Benefitted**

63.     Robinhood's action in first barring, and then severely limiting, the purchase of AMC and NOK on its platform artificially deflated the price of the stocks, harming all investors who held the stock, to the benefit of those holding short positions. This action further harmed investors who intended to buy the stocks in the future, relying on a fair market to be available in the securities.

64.     Ironically, this action was to the benefit of hedge funds that held short positions in these stocks, allowing them to cover their shorts at a much lower price than they otherwise would have been required to purchase the shares. Again, Robinhood stole from the poor to give to the rich.

65.     The harm caused to shareholders of AMC and NOK by Robinhood's restriction of their purchase on its platform was massive. As to AMC, the stock closed on January 27, 2021 at $19.88 per share. After Robinhood barred purchases on January 28, 2021, AMC closed at $8.63 per share, a massive 56.6 percent one-day decrease. In one day, AMC's market capitalization decreased from approximately $5.7 billion to approximately $2.5 billion.

66.     As to NOK, the stock closed on January 27, 2021 at $6.63 per share. After Robinhood barred purchases on January 28, 2021, NOK closed at $4.69 per share, a significant 29.3 percent one-day decrease. In one day, NOK's market capitalization decreased from

approximately $37.3 billion to approximately $26.4 billion.

67.     However, even these numbers underestimate the harm caused to the AMC and NOK stocks. Prior to Robinhood's restrictions on purchasing GME, AMC, NOK, and other similarly-situated stocks, the price of GME was skyrocketing and attracting national attention, and the prices for AMC and NOK were starting to take off as well, attracting increased investor attention as the possible "next GameStop." Retail investor's plans to purchase AMC and NOK on January 28, 2021, and the following days, were well-documented on the WallStreetBets subreddit and other similar platforms across the internet.

68.     Robinhood's restrictions not only stopped this momentum, but allowed a window for those holding short positions in AMC and NOK to cover those shorts at a largely deflated price, upon information and belief, saving hedge funds billions upon billions of dollars as opposed to what would have happened if Robinhood never restricted trading.

69.     Robinhood's manipulation of the market also squelched investor confidence in their ability freely and fairly invest in AMC and NOK, and other similarly-situated securities. Upon information and belief, Robinhood's actions in manipulating the market for these securities scared off a large number of investors who would have otherwise participated in short squeezes of AMC and NOK, massively deflating their stock prices in the short term, and the return available to those holding positions in AMC and NOK.

70.     Plaintiff is a retail customer of Robinhood, holding positions in both AMC and NOK prior to January 28, 2021. Those positions were purchased independently, and without any agreement to do so with any third party. Plaintiff purchased the positions through Robinhood relying upon the continued availability of the platform and free trading of the securities.

71.     Robinhood's action to bar purchases and then severely restrict purchases of those stocks significantly damaged the value of Plaintiff's holdings in AMC and NOK, as it did other holders of those stocks. As explained above, upon news that Robinhood would not allow those stocks to be purchased, only sold, their values fell precipitously.

72.     This left Plaintiff and other Robinhood customers with only two choices, either sell immediately at the rapidly falling price, or hold, and risk losing their entire investment.

73.     Robinhood's actions to restrict purchases of these stocks also disallowed Plaintiff from executing plans to buy additional positions in AMC and NOK, during the restricted period, which otherwise would have been profitable.

74.     Contrarily, Robinhood benefitted. As explained above, by barring and then severely restricting purchases of AMC, NOK, and other similarly-situated stocks, Robinhood represents that it lowered its deposit requirements with the NSCC. By squelching retail investor interest in short squeezes—trading activity that Robinhood represents raises its deposit requirements—Robinhood would not only decrease its deposit requirements in the short term, but on an ongoing basis, if Robinhood was successful in killing the trend.

75.     These deposit requirements are no small thing—with Robinhood being unable (or unwilling) to meet its deposit requirements on January 28, 2021, continued popularity of trading strategies deemed as "volatile" and requiring larger deposit requirements could quite literally put the firm out of business.

76.     Robinhood's actions are without substantial justification, and made to the detriment of its longstanding customers and the market. Where Robinhood claims it acted to protect its customers or the market, it in fact caused them great harm. Indeed, in Mr. Tenev's recent interview with Elon Musk, he admitted:  "We knew this was a bad outcome for customers."

**G.     Confidence in the Marketplace's Integrity Is Harmed**

77.     Robinhood's actions received widespread coverage in the press, with their obvious manipulation of the stock market causing outrage. The SEC shared in the concern, releasing a statement that it would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities."

78.     In a rare moment of bipartisan agreement, both Democratic Representative Alexandria Ocasio-Cortez and Republican Senator Ted Cruz agreed that Robinhood's actions in restricting the purchases of GME, AMC, NOK, and other similarly-situated stocks, were "unacceptable":



**Ted Cruz** ✔
@tedcruz                                          · · ·

Fully agree. 👇

> 🧑 **Alexandria Ocasio-Cortez** ✔ @AOC · Jan 28
>
> This is unacceptable.
>
> We now need to know more about @RobinhoodApp's decision to block retail investors from purchasing stock while hedge funds are freely able to trade the stock as they see fit.
>
> As a member of the Financial Services Cmte, I'd support a hearing if necessary. twitter.com/motherboard/st…
>
> Show this thread

8:47 AM · Jan 28, 2021 · Twitter for iPhone

79.     Again, upon information and belief, this unfairness in the stock market, to the benefit of large institutional investors like hedge funds, has already, and will continue to, prevent many retail investors from participating in the market. Specifically, the understanding that hedge funds play by a separate set of rules will prevent many retail traders from engaging in trading strategies that stand to harm hedge funds, like a short squeeze of AMC or NOK, for fear that even if the investment strategy is prudent, hedge funds and other powerful market participants will manipulate the market in their favor.

## **CLASS ACTION ALLEGATIONS**

80.     Plaintiff brings this action on behalf of himself and putative classes of Robinhood customers who are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

81.     The AMC Class seeks monetary damages and injunctive relief, and is defined as follows:

- All persons or entities in the United States that held a position in AMC on January 28, 2021, purchased through Robinhood, that were harmed by Robinhood's actions to bar and later restrict trading of the stock.

82.     The NOK Class seeks monetary damages and injunctive relief, and is defined as follows:

- All persons or entities in the United States that held a position in NOK on January

28, 2021, purchased through Robinhood, that were harmed by Robinhood's actions to bar and later restrict trading of the stock.

83.     Upon information and belief, the AMC Class and NOK Class include millions of investors. The exact number and identities of members for the AMC Class and NOK Class is known or readily ascertainable by Robinhood through a review of records they should maintain. The number of persons who fall within the definition of both classes is so numerous and geographically dispersed as to make joinder of all members of the classes in their individual capacity impracticable, inefficient, and unmanageable so as to effectively deny each putative AMC Class and NOK Class member his, her, or their right to prosecute and obtain legal and equitable relief based on the claims and allegations made in this Complaint.

84.     There are common questions of law and fact as to the AMC Class and NOK Class, relating to and/or dispositive of the allegations made in the Complaint, and damages alleged therein, including, but not limited to:

- Whether Robinhood breached its user agreement or the covenant of good faith and fair dealing when restricting purchasing of AMC and NOK stocks;

- Whether Robinhood concealed the fact that it lacked the capital to assure the availability of its trading platform;

- Whether Robinhood created a fiduciary duty with its customers by purporting to restrict purchases of certain securities to "protect" them, and whether Robinhood violated any such duty;

- Whether Robinhood intentionally or negligently interfered with its customers planned, profitable transactions in AMC and NOK;

- Whether Robinhood engaged in unfair competition pursuant to Cal. Bus. & Prof. Code § 17200 et seq. by restricting the purchasing of AMC and NOK;

- Whether Robinhood violated California's Consumer Legal Remedies Act Unfair by restricting the purchasing of AMC and NOK; and

- The harm caused to the share price of AMC and NOK from Robinhood's restrictions on the purchasing of those stocks.

85.     The interests of Plaintiff, the AMC Class, and the NOK Class are aligned. Plaintiff seeks to establish that Robinhood is liable for financial harm suffered by its customers resulting from their inability to purchase AMC and NOK. Should Plaintiff succeed in establishing such liability, each of the other members of the AMC Class and NOK Class would then be entitled to

1   similar compensation their damages.

2         86.     The claims of Plaintiff are typical of the claims of the AMC Class and NOK Class.

3   Plaintiff purchased positions in AMC and NOK through Robinhood prior to January 28, 2021,

4   those positions being harmed by the inability of Plaintiff and other Robinhood customers to trade

5   in GME, AMC, NOK, and other similarly-situated stocks. Like many others, Plaintiff also

6   intended to purchase further positions in AMC and NOK during the period in which such

7   purchases were restricted.

8         87.     The AMC Class and NOK Class are represented by counsel who are competent and

9   experienced in the prosecution and defense of similar claims and litigation, including class actions

10  filed, prosecuted, defended, and litigated under California and federal law, in California and

11  federal courts, in connection with claims and certification of nationwide classes. Counsel also has

12  significant experience in high-stakes commercial litigation and securities-related matters.

13        88.     The prosecution of separate actions by individual members of the AMC Class and

14  NOK Class would create a risk of inconsistent or varying adjudications.

15        89.     The questions of law and fact common to the members of the AMC Class and NOK

16  Class predominate over any questions of law or fact affecting only individual members of the

17  AMC Class or NOK Class. Primarily at issue is the appropriateness of the actions of Robinhood in

18  restricting purchases of AMC and NOK.

19        90.     A class action is superior to other available methods for the fair and efficient

20  adjudication of this controversy. Treatment as a class action will permit a large number of

21  similarly situated persons to adjudicate their common claims in a single forum simultaneously,

22  efficiently, and without the duplication of effort and expense that numerous individual actions

23  would engender. Prosecution as a class action will eliminate the need for repetitious litigation—if

24  it were even feasible for many members of the AMC Class or NOK Class to proceed individually.

25        91.     Members of the AMC Class and the NOK Class have no cognizable interest in

26  individually litigating and controlling the claims asserted herein as a general matter. To the extent

27  any particular class members have larger claims they desire to individually litigate, such concerns

28  can be addressed by offering class members an opt-out.

1      92.     California is the proper and a desirable forum for the claims against Robinhood to

2  be litigated. Robinhood is based in California, and its user agreement specifies California law as

3  governing:

> This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

8  Thus, each of the contract-based claims brought against Robinhood must be governed by

9  California law. To the extent any tort-based claims could be held to escape the scope of this

10  governing law provision, California law provides appropriate remedies to each member of the

11  AMC Class and NOK Class.

12      93.     The AMC Class and NOK Class are readily ascertainable by review of

13  Robinhood's records, which would also include contact information for the members. Thus, there

14  does not exist any significant likely difficulties in managing the claims as a class action.

### FIRST CAUSE OF ACTION

### (Breach of Contract)

17      94.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

18  each of the allegations set forth in paragraphs 1 through 93 above.

19      95.     Robinhood, on one hand, and the Plaintiff and putative classes, on the other hand,

20  entered into contracts whereby the Plaintiff and putative classes were allowed to use the

21  Robinhood platform to place trades in the stock market, providing specifically as follows:

> All orders for the purchase of securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended.

24      96.     In consideration for Plaintiff's and the putative classes' ability to use the

25  Robinhood platform to trade, the Plaintiff and the putative classes provided consideration to

26  Robinhood in the form of fees, and the ability to route their trades to market makers from which

27  Robinhood receives additional fees, and access to trading data to sell to third parties, among other

28  valuable consideration.

97.     While Robinhood's user agreement does purport to provide Robinhood with the ability to restrict trading in its "sole discretion[,]" that Robinhood only exercise such an option in good faith must be read into the contract or the contract would be rendered illusory.

98.     Here, Robinhood restricted purchases of AMC and NOK, among other similarly-situated stocks, with the intent to roadblock the short squeeze trading strategy and avoid increased clearinghouse deposit requirements. This is not a good faith reason to restrict the Plaintiff's nor the putative classes' ability to make purchases of the restricted securities.

99.     Moreover, the user agreement provides that:

> I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis. I understand that Robinhood Securities carries My Account(s) and is responsible for the clearing and bookkeeping of transactions[.]

100.    To the extent Robinhood Securities refused to clear trades in AMC or NOK, it breached its duty to clear trades on behalf of Plaintiff and the putative classes under the user agreement.

101.    As a result of these breaches, the Plaintiff's and the putative classes' positions in AMC and NOK have been substantially harmed.

## SECOND CAUSE OF ACTION

### (Concealment)

102.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 101 above.

103.    Robinhood disclosed to Plaintiff and the putative classes that it would clear trades in-house through Robinhood Securities. As set forth in more detail above, Robinhood represented that clearing trades in-house would be more reliable and give customers the best experience. Robinhood also specifically discussed the challenges it faced when developing Clearing by Robinhood.

104.    However, Robinhood failed to disclose that it was undercapitalized and lacking in liquidity such that it could not make sufficient capital deposits to allow certain trading on its

platform (or would have incurred costs to raise the capital it was unwilling to incur). This solution certainly was not "more reliable" than using other established clearinghouses with much higher capital on hand, which upon information and belief, were able to allow continued purchasing of GME, AMC, NOK, and other similarly-situated stocks.

105.    This lack of disclosure is particularly troubling given Robinhood's business model, which encourages retail traders to engage in short-term trading using options and margin, risky by its very nature. It was entirely foreseeable that Robinhood users could engage in trading deemed "volatile" by clearinghouses and thus raise its deposit requirements, and if Robinhood had insufficient capital to cover such increased deposit requirements, that should have been disclosed to its customers.

106.    Plaintiff and the putative classes were unaware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading.

107.    Robinhood acted intentionally in concealing this information, knowing that a public admission it lacked sufficient capital to back the Clearing by Robinhood platform would decrease customer confidence, and thus lessen the amount of Robinhood users and revenue received by Robinhood.

108.    Had Plaintiff or the putative classes been aware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading, they would have chosen to trade with another firm with sufficient capital to guarantee availability of the trading platform.

109.    Plaintiff and the putative classes were harmed by this omission; their ability to trade in AMC and NOK being restricted, whereas had they chosen another trading platform with sufficient capitalization, this restriction and the resulting harm to their positions in AMC and NOK would not have occurred.

110.    Robinhood's concealment of this information was a substantial factor in causing this harm. It resulted directly in the inability of Plaintiff and the putative classes to freely purchase AMC and NOK, and caused significant damage to the price of shares in those stocks as previously

1   explained.

2                                        **THIRD CAUSE OF ACTION**

3                                        **(Negligent Misrepresentation)**

4           111.   Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

5   each of the allegations set forth in paragraphs 1 through 110 above.

6           112.   As quoted above, Robinhood represented that use of Robinhood Securities as

7   Robinhood's clearinghouse would make the Robinhood platform more reliable and give customers

8   the best experience.

9           113.   Given the undercapitalization described above, resulting in Robinhood restricting

10  purchases of the affected securities, whereas, upon information and belief, other clearinghouses

11  were able to meet deposit requirements, these representations were not true.

12          114.   Robinhood, being aware of its own finances and lack of capitalization when

13  compared to well-established clearinghouses, had no reasonable grounds to believe its

14  representations were true.

15          115.   Robinhood intended that Plaintiff and the putative classes would rely on their

16  representation—the representation being made to assure Robinhood customers that Robinhood

17  would provide a reliable platform to trade in securities.

18          116.   Plaintiff and the putative classes reasonably relied on this misrepresentation, and

19  were harmed by that reliance in the manner described above.

20          117.   As explained above, reliance on this misrepresentation was a substantial factor in

21  the harm caused to the Plaintiff and putative classes, who otherwise would have chosen another

22  platform to trade.

23                                       **FOURTH CAUSE OF ACTION**

24                          **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

25          118.   Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

26  each of the allegations set forth in paragraphs 1 through 117 above.

27          119.   Robinhood, by virtue of its contracts with Plaintiff and the putative classes, had an

28  implied covenant of good faith and fair dealing under those contracts.

1     120.    Plaintiff and the putative classes performed or substantially performed under these

2    contracts by buying and selling securities using the Robinhood platform.

3     121.    Robinhood violated that covenant by restricting the ability of Plaintiff and the

4    putative classes to purchase AMC and NOK.

5     122.    This action was not taken in good faith, but upon information and belief, to

6    manipulate the market by disincentivizing a popular trading strategy that stood to harm Robinhood

7    by way of increased clearinghouse deposit requirements.

8     123.    As a result of these breaches, the Plaintiff's and the putative classes' positions in

9    AMC and NOK have been substantially harmed.

10    **<u>FIFTH CAUSE OF ACTION</u>**

11    **(Breach of Fiduciary Duty)**

12     124.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

13    each of the allegations set forth in paragraphs 1 through 123 above.

14     125.    Robinhood, by taking the action to restrict purchasing of AMC, NOK, and other

15    similarly-situated stocks, purportedly to "protect" it customers, created a fiduciary duty similar to

16    that of an investment advisor.

17     126.    Robinhood breached that duty by acting only in its own interests, to reduce

18    clearinghouse deposit requirements.

19     127.    As a result of these breaches, the Plaintiff's and the putative classes' positions in

20    AMC and NOK have been substantially harmed.

21    **<u>SIXTH CAUSE OF ACTION</u>**

22    **(Intentional Interference with Prospective Economic Advantage)**

23     128.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

24    each of the allegations set forth in paragraphs 1 through 127 above.

25     129.    The Plaintiff and the putative classes, as set forth in detail herein, stood to make

26    significant profit by virtue of their holdings in and future purchases of AMC and NOK.

27    Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties

28    to sell their shares at a profit in the future.

1      130.    Robinhood intentionally interfered with these future transactions by first barring

2  and then severely restricting purchases of AMC and NOK.

3      131.    This interference artificially depressed the price of shares in AMC and NOK, by

4  not allowing Robinhood customers to purchase these securities and sparking doubt about the

5  security of future trading in these securities more generally.

6      132.    Robinhood had actual knowledge that its customers intended to enter into

7  transactions involving AMC and NOK, the increased investor interest in those stocks receiving

8  significant attention in the public domain, and their restriction being the subject of discussion with

9  the NSCC.

10     133.    Robinhood acted with improper motive in restricting purchases of AMC and NOK,

11  motivated by manipulating the market to disincentive a trading strategy that was stretching its

12  deposit requirements beyond comfort levels and threatening the availability of its trading platform.

13     134.    This restriction of the ability to purchase AMC and NOK substantially harmed the

14  profitability of Plaintiff's and the putative classes' planned sales of their shares.

15                          **SEVENTH CAUSE OF ACTION**

16              **(Negligent Interference with Prospective Economic Advantage)**

17     135.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

18  each of the allegations set forth in paragraphs 1 through 134 above.

19     136.    The Plaintiff and the putative classes, as set forth in detail herein, stood to make

20  significant profit by virtue of their holdings in and future purchases of AMC and NOK.

21  Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties

22  to sell their shares at a profit in the future.

23     137.    Robinhood negligently interfered with these future transactions by first barring and

24  then severely restricting purchases of AMC and NOK.

25     138.    This interference artificially depressed the price of shares in AMC and NOK, by

26  not allowing Robinhood customers to purchase these securities and sparking doubt about the

27  security of future trading in these securities more generally.

28     139.    Robinhood had actual knowledge that its customers intended to enter into

1    transactions involving AMC and NOK, the increased investor interest in those stocks receiving

2    significant attention in the public domain, and their restriction being the subject of discussion with

3    the NSCC.

4            140.    Robinhood failed to act with reasonable care when implementing these restrictions.

5            141.    Robinhood acted with improper motive in restricting purchases of AMC and NOK,

6    motivated by manipulating the market to disincentive a trading strategy that was stretching its

7    deposit requirements beyond comfort levels and threatening the availability of its trading platform.

8            142.    This restriction of the ability to purchase AMC and NOK harmed the profitability

9    of Plaintiff's and the putative classes' planned sales of their shares, and was a substantial cause of

10   the same.

11                              **EIGHTH CAUSE OF ACTION**

12    **(Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.])**

13           143.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

14   each of the allegations set forth in paragraphs 1 through 142 above.

15           144.    The aforementioned conduct by Robinhood is unlawful, violating California and

16   Federal securities laws.

17           145.    Robinhood engaged in unfair competition in the classic sense by purporting to offer

18   a trading platform backed by sufficient capital, when it was not, thus stealing customers that

19   otherwise would have chosen other platforms.

20           146.    It also engaged in unfair competition in the classic sense by not allowing its

21   customers to fairly compete with institutional investors when it comes to trading AMC and NOK,

22   and other similarly-situated stocks.

23           147.    Plaintiff and each member of the putative classes suffered an injury as a direct and

24   proximate result of Robinhood's unlawful and anticompetitive conduct.

25           148.    Plaintiff and the putative classes are without an adequate remedy at law. Unless

26   enjoined, Robinhood will continue to unlawfully interfere in the market for highly-shorted stocks,

27   like AMC and NOK.

28           149.    Upon information and belief, the above-described unlawful conduct occurred in

1  significant portion within California.

2  <u>**NINTH CAUSE OF ACTION**</u>

3  **(Violation of California's Consumer Legal Remedies Act Unfair [Cal. Civ. Code § 1750 et**

4  **seq.])**

5  150.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

6  each of the allegations set forth in paragraphs 1 through 149 above.

7  151.    Robinhood has committed unlawful acts as defined by California Civil Code §

8  1770, by engaging in the unlawful practices described above.

9  152.    Plaintiff and each member of the putative classes suffered an injury as a direct and

10  proximate result of Robinhood's unlawful activity.

11  153.    Plaintiff and the putative classes are without an adequate remedy at law. Unless

12  enjoined, Robinhood will continue to unlawfully interfere in the market for highly-shorted stocks,

13  like AMC and NOK.

14  154.    Upon information and belief, the above-described operations of Robinhood occur

15  in California, where it is headquartered.

16  <u>**PRAYER FOR RELIEF**</u>

17  WHEREFORE, Plaintiff, the putative AMC Class, and the putative NOK Class, pray for

18  relief against Robinhood as follows:

19  1.    For preliminary and permanent injunctions enjoining and restraining Robinhood

20  from restraining or attempting to restrain its customers from trading in AMC or NOK, or other

21  securities with significant short positions;

22  2.    For money damages in the form of the lessened value in their AMC and NOK

23  positions, and loss of future profitable acquisitions of AMC and NOK positions, in an amount

24  according to proof, but well in excess of $5 million;

25  3.    For punitive damages according to proof;

26  4.    For pre-judgment interest on all damages awarded by this Court;

27  5.    For reasonable attorneys' fees and costs of suit incurred herein; and

28  6.    For any other such relief as this Court deems just and proper.

1

DATED:  March 15, 2021

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
   Dennis S. Ellis
   Keith J. Wesley
   Katherine F. Murray
   Carl Alan Roth
   Matthew L. Venezia

By:  _____*/s/ Matthew L. Venezia*_____
        Matthew L. Venezia
Attorney for Plaintiff Robert Days

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-

SECOND AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

3   Civil Procedure.

4   DATED:  March 15, 2021                    BROWNE GEORGE ROSS
                                              O'BRIEN ANNAGUEY & ELLIS LLP
5                                                  Dennis S. Ellis
                                                   Keith J. Wesley
6                                                  Katherine F. Murray
                                                   Carl Alan Roth
7                                                  Matthew L. Venezia

8                                             By:    _____/s/ Matthew L. Venezia_____

9                                                    Matthew L. Venezia
                                              Attorney for Plaintiff Robert Days
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2021, I electronically filed the foregoing **SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**SERVICE LIST**
**Robert Days v. Robinhood Markets, Inc., et al.**
**Case No. 4:21-cv-00696-YGR**

C. Brandon Wisoff
Eric D. Monek Anderson
**Farella Braun + Martel LLP**
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone       (415) 954-4400
Facsimile:      (415) 954-4480
Email:          emonekanderson@fbm.com
Email:          bwisoff@fbm.com

Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
**Cravath, Swaine & Moore LLP**
815 Eighth Avenue
New York, NY 10019
Telephone:      (212) 474-1000
Facsimile:      (212) 474-3700
Email:          aryan@cravath.com
Email:          korsini@cravath.com
Email:          bsukiennik@cravath.com

_____
Andrea A. Augustine